**JOHNSON FISTEL, LLP**
BRETT M. MIDDLETON
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
brettm@johnsonfistel.com

*Attorneys for Plaintiff Grant Smith*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRANT SMITH, derivatively on behalf of FUNKO INC., a Delaware corporation,<br><br>       Plaintiff,<br><br>      v.<br><br>BRIAN MARIOTTI, RUSSELL NICKEL, ANDREW PERLMUTTER, JENNIFER FALL JUNG, GINO DELLOMO, MICHAEL LUNSFORD, CHARLES DENSON, ADAM KRIGER, KEN BROTMAN, DIANE IRVINE, AND SARAH KIRSHBAUM LEVY,<br><br>      Defendants,<br><br>      -and-<br><br>FUNKO INC., a Delaware corporation,<br><br>      Nominal Defendant | Case No. 2:22-cv-03155-WLH (MAA)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT**<br><br>Date:      April 12, 2024<br>Time:     1:30 p.m.<br>Courtroom:  9B, 9th Floor<br>Judge:    Hon. Wesley L. Hsu |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND .....................................4

    A.  Factual Background ........................................................4

    B.  Procedural Background ....................................................5

        1.  The Demand Made Action.........................................5

        2.  The Delaware Demand Made Action ..........................6

        3.  The Demand Futility Action ......................................6

    C.  Settlement Negotiations ..................................................7

III.  TERMS OF THE PROPOSED SETTLEMENT ......................................8

IV.  PRELIMINARY APPROVAL STANDARDS ........................................12

V.  THE PROPOSED SETTLEMENT
WARRANTS PRELIMINARY APPROVAL ............................................13

    A.  The Settlement Enjoys A Presumption Of
Fairness Because It Is The Product Of Good
Faith, Arm's-Length Negotiations ......................................13

    B.  The Settlement Is Well Within The Range
Of Possible Approval .....................................................16

        1.  The Settlement Confers  Substantial
Benefits On Funko And Its Stockholders .................16

        2.  The Risk And Expense Of Trying To
Improve Upon The Settlement Through
Further Litigation ...............................................20

VI.  NOTICE TO STOCKHOLDERS .................................................21

VII.  PROPOSED SCHEDULE OF EVENTS .........................................23

VIII.CONCLUSION .................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Clark v. Ecolab Inc.*,
  2010 WL 1948198 (S.D.N.Y. May 11, 2010).......................................................... 14

*Class Plaintiffs v. Seattle*,
  955 F.2d 1268 (9th Cir. 1992)............................................................................ 12

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005)................................................................. 20

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)................................................................................. 15

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)............................................................................ 13

*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*,
  2010 WL 4027632 (S.D. Cal. Oct. 14, 2010) ..................................................... 15

*In re Apple Computer, Inc. Deriv. Litig.*,
  2008 WL 4820784 (N.D. Cal. Nov. 5, 2008)................................................ 16, 17

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000).................................................................. 13

*In re Emerson Radio S'holder Deriv. Litig.*,
  2011 WL 1135006 (Del. Ch. Mar. 28, 2011)...................................................... 19

*In re First Cap. Holdings Corp. Fin. Prod. Sec. Litig.*,
  1992 WL 226321 (C.D. Cal. June 10, 1992) ...................................................... 14

*In re: Hewlett-Packard Co. S'holder Deriv. Litig.*,
  716 F. App'x 603 (9th Cir. 2017)....................................................................... 16

*In re NVIDIA Corp. Deriv. Litig.*,
  2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ................................................... 12

*In re NVIDIA Corp. Deriv. Litig*,
  2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009)................................. 16

*In re OSI Sys., Inc. Deriv. Litig.*,
  2017 WL 5642304 (C.D. Cal. May 2, 2017) ...................................................... 16

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995)................................................................... 12, 14, 20

*In re Pfizer Inc. S'holder Deriv. Litig.*,
  780 F. Supp. 2d 336 (S.D.N.Y. 2011) .................................................................. 17

*In re Pinterest Deriv. Litig.*,
  2022 WL 484961 (N.D. Cal. Feb 16, 2022) ........................................................ 16

*In re PMC-Sierra, Inc. Deriv. Litig.*,
  2010 U.S. Dist. LEXIS 5818 (N.D. Cal. Jan. 26, 2010) ...................................... 22

*In re Xoma Corp. Sec. Litig.*,
  1992 U.S. Dist. LEXIS 10502 (N.D. Cal. July 10, 1992) ..................................... 12

*Lewis v. Anderson*,
  692 F.2d 1267 (9th Cir. 1982) ............................................................................. 17

*Lewis v. Newman*,
  59 F.R.D. 525 (S.D.N.Y. 1973) ........................................................................... 20

*Lloyd v. Gupta*,
  2016 WL 3951652 (N.D. Cal. July 22, 2016) ...................................................... 16

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ......................................................................... 16, 21

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ............................................................................................ 16

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ............................................................................................ 22

*Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*,
  2009 WL 353746 (Del. Ch. Feb. 12, 2009) ........................................................ 21

*Officers for Just. v. Civ. Serv. Comm'n of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ......................................................................... 12, 13

*Spiegel v. Buntrock*,
  571 A.2d 767 (Del. 1990) .................................................................................... 20

*True v. Am. Honda Motor Co., Inc.*,
  2009 WL 838284 (C.D. Cal. Mar. 25, 2009) .................................................. 13, 21

*U.S. v. McInnes*,
  556 F.2d 436 (9th Cir. 1977) ............................................................................... 12

*Villanueva v. Morpho Detection, Inc.*,
  2015 WL 4760464 (N.D. Cal. Aug. 12, 2015) ..................................................... 13

*Williams v. First Nat. Bank*,
  216 U.S. 582 (1910) ............................................................................................ 12

iii

**Rules**

Fed. R. of Civ. Proc. 23.1 ...................................................................... 12, 21

**Other Authorities**

*Manual For Complex Litigation*
§21.632 (4th Ed. 2004) ............................................................... 13

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the proposed settlement as set forth in the Stipulation ("Settlement") is within the range of possible approval such that the form and means of notice of the Settlement pursuant to the Stipulation should be directed to Current Funko Stockholders and a date for a hearing to determine whether to finally approve the Settlement ("Settlement Hearing") should be set by the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs respectfully submit this memorandum in support of their Unopposed Motion for Preliminary Approval of Derivative Settlement ("Settlement").[1]    The proposed Settlement resolves stockholder derivative claims brought on behalf of nominal defendant Funko Inc. ("Funko" or the "Company") against certain of its current and former directors and officers in the following matters: (1) the Demand Made Action, pending in this Court; (2) the Demand Futility Action, also pending in this Court; and (3) the Delaware Demand Made Action, pending in the Delaware Court of Chancery.    The Settlement is the product of extensive arm's-length negotiations between the Settling Parties, overseen by an experienced mediator, Michelle Yoshida, Esq. of Phillips ADR Enterprises (the "Mediator").    Stip., §I.C.

In connection with the Settlement, Funko agreed to maintain for at least four years corporate governance reforms (the "Measures") that will significantly improve the Company's internal controls and procedures relating to, *inter alia*, Board independence and diversity, Board- and management-level oversight of risk and public disclosures (including, in particular, as it relates to inventory and other important operational metrics), and sales of Company stock by insiders.    Stip., §V.2.1

---

[1] The Settlement's terms are set forth in the Stipulation of Settlement ("Stipulation" or "Stip.") executed by the parties on March 4, 2024, filed concurrently herewith as **Exhibit 1** to the Declaration of Brett M. Middleton in Support of Unopposed Motion for Preliminary Approval of Derivative Settlement (the "Middleton Decl.").

& Ex. A.  Specifically, the Settlement calls for, *inter alia*, (i) the creation of the new position of Senior Director of Environmental, Social and Governance ("ESG Director"); (ii) the addition of a new independent director to the Board; (iii) enhancements to the Nominating and Corporate Governance Committee Charter designed to ensure qualified and diverse membership on the Board moving forward; (iv) enhanced Audit Committee oversight duties specifically related to the Company's inventory and related issues; (v) enhancements to the duties and responsibilities of the management-level Disclosure Committee to ensure the truthfulness of the Company's public disclosures, including as it relates to relevant inventory and sales data and other key operational metrics; (vi) enhancements related to non-employee director compensation; (vii) additional duties and responsibilities of Funko's Controller related to the Company's public disclosures and internal controls; (viii) improvements to the Company's insider trading policy; and (ix) increased stockholder transparency and access. *Id.*

After reaching agreement in principle on the substantive consideration for the Settlement, the Settling Parties commenced good faith, arm's-length negotiations concerning attorneys' fees and expenses to be paid to Plaintiffs' Counsel, all overseen and assisted by the Mediator.  Pursuant to a formal mediator's proposal ultimately accepted by all parties, and in recognition of the substantial benefits the Settlement confers on Funko and its stockholders, Defendants' D&O insurers have agreed to pay Plaintiffs' Counsel an award of attorneys' fees and expenses of $2,150,000 (the "Fee and Expense Amount"), subject to Court approval.[2]

At the preliminary approval stage, the Court need only determine that the proposed Settlement is within the range of what might be found to be fair, reasonable,

---

[2] At this stage of the settlement approval process, the Court is not being asked to evaluate or approve the agreed Fee and Expense Amount beyond determining that the Settlement as a whole falls within a range that might be approved as fair and reasonable.

and adequate, such that notice of the Settlement should be provided to Current Funko Stockholders and a Settlement Hearing scheduled for consideration of final settlement approval. The proposed Settlement plainly meets this standard. The Settlement is a product of arm's-length negotiations, including **two formal mediation sessions**, facilitated by a well-respected mediator. Plaintiffs' Counsel were well-informed of the strengths and weaknesses of the claims based on their investigation, which included a review and analysis of (among other things) **more than 1,200 pages of internal corporate books and records** that were produced to Plaintiffs by Funko in connection with the Litigation.

Plaintiffs' Counsel submit that the Settlement is fair, reasonable and adequate because the Measures directly address the wrongdoing alleged in the Litigation and will confer substantial benefits on Funko by reducing the chances that Funko and its stockholders will lose investor confidence and be subjected to additional legal exposure moving forward, enhancing the value of the Company through better decision-making, and helping ensure investor confidence in the accuracy of the Company's public disclosures, the integrity of its management, and the independence and effectiveness of the Company's corporate governance and Board oversight.

Notably, the independent members of Funko's Board (including all independent, non-defendant members) have determined, in a good faith exercise of their business judgment, that: (i) the litigation demands, the Litigation, and the Plaintiffs' and Plaintiffs' Counsels' efforts were a substantial and material factor in Funko's decision to adopt, implement and maintain the Measures for the agreed upon term; (ii) the Measures provide a significant and material benefit to Funko and its stockholders; and (iii) the Settlement and each of its terms are fair, reasonable, and in the best interests of Funko and its stockholders. Stip., §IV.

The proposed schedule and form and means of notice of the Settlement are adequate to apprise Current Funko Stockholders of the Settlement's terms and to

3

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

afford them a fair opportunity to comment on the Settlement.  Accordingly, Plaintiff Smith respectfully requests that the Court enter the [Proposed] Preliminary Approval Order (**Exhibit B** to the Stipulation and submitted herewith) that grants preliminary approval of the proposed Settlement, directs that notice be given to Current Funko Stockholders, and schedules a Settlement Fairness Hearing.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Funko, a Delaware corporation, is a leading pop culture lifestyle company that creates whimsical, fun, and unique products that enable fans of TV shows, movies, video games, sports teams, and music to express their affinity for pop culture properties and trends.  ¶¶3, 49–68.[3]

The Litigation alleges that the Individual Defendants breached their fiduciary duties to Funko and its stockholders by making or causing Funko to make allegedly materially false and misleading public statements and omissions regarding the Company's sales and growth in Securities and Exchange Commission ("SEC") filings and press releases and allegedly failing to disclose important adverse facts about Funko's operations and financial forecast regarding the Company's lower-than-expected sales and the risk that Funko may need to "write-down" slower moving inventory.  ¶¶3, 49–68.  Specifically, Plaintiffs allege that the Company had amassed a large amount of excess and obsolete inventory by August 2019, in part due to issues with the Company's internal sales forecasting practices.  Plaintiffs allege that Defendants represented that the accumulation of excess inventory was only a possible, future business risk, when that risk had already materialized.  ¶¶5, 49–60.

---

[3] Unless otherwise noted, all references to "¶__" or "¶¶__" are to the Verified Shareholder Derivative Complaint filed by plaintiff Smith in the Demand Made Action on May 9, 2022.  ECF No. 1.

Plaintiffs further allege that on October 31, 2019, certain of the Defendants confirmed the Company's FY2019 guidance, even though by September 2019, Plaintiffs allege that Defendants knew Funko would be unable to meet the FY2019 earnings guidance, as there were not enough products tied to the fourth quarter releases to meet the guidance, customer demand for the new fourth quarter products was insufficient to generate the sales necessary to meet the guidance, and Funko could not make up the difference by selling its aged, excess inventory. ¶¶6, 61–68.

Plaintiffs also allege that on September 19, 2019, Funko conducted a secondary offering (the "Offering"), consisting of shares sold by Defendant Mariotti and various entities affiliated with ACON Investments, L.L.C. ("ACON"). Plaintiffs allege that all proceeds from the Offering—amounting to over $ 100 million—went to Defendant Mariotti and ACON—not to Funko. ¶¶7, 74–76.

Among other alleged damages to Funko, the Litigation alleges that the Individual Defendants' conduct exposed Funko to liability in the consolidated securities class action captioned *Ferreira v. Funko, Inc., et al.,* No. 2:20-cv-02319 (C.D. Cal.) (the "Securities Class Action"). ¶¶11, 118–22. The Securities Class Action settled for $7 million.[4]

## B.    Procedural Background

### 1.    The Demand Made Action

On October 21, 2020, Plaintiff Smith issued a formal litigation demand (the "Litigation Demand") to Funko's Board of Directors (the "Board"), wherein he demanded that the Board commence a civil action against the Individual Defendants to recover for the benefit of the Company the amount of damages sustained by Funko as a result of their breaches of fiduciary duties alleged herein. Stip., §I.B.2. Over the next year and a half, the parties exchanged numerous letters addressing their positions

---

[4] Defendants deny each and every one of the allegations set forth above.

concerning the Litigation Demand, the Board's response, the formation of the Special Litigation Committee, tolling agreements, and the status of the related Securities Class Action. *Id.*[5]

On May 9, 2022, Plaintiff Smith filed a complaint in this Court, alleging that the Litigation Demand was wrongfully refused by the Individual Defendants and asserting claims on Funko's behalf against the Individual Defendants for violations of §10(b) of the Exchange Act, breach of fiduciary duties (the alleged wrongful refusal of the Litigation Demand, disclosure, and oversight violations), unjust enrichment, waste of corporate assets, and insider selling (the previously defined "Demand Made Action"). *Id.*

### 2. **The Delaware Demand Made Action**

On June 25, 2021, Plaintiffs Fletcher and Rubin issued their litigation demand to the Board, alleging wrongdoing and demanding that the Board investigate and initiate litigation against the culpable fiduciaries. §I.B.3. Over the following two years, the parties exchanged numerous letters addressing their respective positions concerning (among other things) the Litigation Demand, the Board's response, the formation of the Special Litigation Committee, tolling agreements, and the status of the related Securities Class Action. *Id.* On July 5, 2022, Plaintiffs Fletcher and Rubin filed a complaint in Delaware Court of Chancery, alleging that their litigation demand was wrongfully refused and asserting claims on Funko's behalf against the Individual Defendants for breach of fiduciary duties and unjust enrichment (the previously defined "Delaware Demand Made Action"). *Id.*

### 3. **The Demand Futility Action**

On April 23, 2020, Plaintiffs Cassella, Marconi, and Plummer filed a stockholder derivative action in this Court on behalf of Funko against certain of its

---

[5] For a more detailed recitation of the Litigation's procedural history, Plaintiff Smith respectfully refers the Court to section I.B. of the Stipulation of Settlement.

officers and directors (the "*Cassella* Action").  On June 5, 2020, Plaintiff Evans filed a stockholder derivative action in this Court (the "*Evans* Action").  On June 10, 2020, Plaintiff Igelido filed a stockholder derivative action in this Court (the "*Igelido* Action").  *Id.*, §I.B.1.

On July 6, 2020, the Court entered an Order consolidating the Cassella, Evans, and Igelido Actions into a consolidated derivative action (the previously defined "Demand Futility Action") and appointed Gainey McKenna & Egleston and The Rosen Law Firm, P.A. as Co-Lead Counsel.  On August 13, 2020, the Court stayed the Demand Futility Action pending the resolution of the motion to dismiss in the Securities Class Action.  *Id*.

On February 23, 2023, the Court ordered the Demand Futility Action stayed pending the filing of a motion to approve the Settlement.  *Id*.

### C.    Settlement Negotiations

On December 21, 2021, plaintiffs in the Demand Futility Action served a settlement demand.  On April 27, 2022, counsel for parties in the Demand Futility Action attended a full-day mediation (the "Full-Day Mediation") with the Mediator. No settlement was reached at that time, but additional detailed written proposals and counterproposals were thereafter exchanged and debated in numerous communications.  *Id.*, §I.C.

On May 16, 2022, Plaintiff Smith served a detailed settlement demand in the Demand Made Action.  Counsel for plaintiffs in the Demand Made Action and the Delaware Demand Made Action (collectively, the "Demand Made Actions") thereafter began coordinating efforts and, on July 15, 2022, served a joint settlement demand.  *Id*.

Between August 1, 2022, and December 8, 2022, the Settling Parties exchanged numerous written proposals and counterproposals and debated in numerous communications the terms of settlement.  *Id*.

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

On December 14, 2022, the parties participated in a half-day Zoom video conference mediation (the "Half-Day Mediation") with the Mediator.  While the December 14, 2022, Half-Day Mediation ended without a settlement, the Settling Parties made meaningful progress and continued their settlement negotiations, with the Mediator's assistance.  Additional written proposals and counterproposals were exchanged and debated in numerous communications.  *Id*.

On March 10, 2023, the Settling Parties reached an agreement in principle on the corporate governance measures that will be adopted by Funko as consideration for a global resolution of the Litigation.  Thereafter, the Settling Parties negotiated and finalized the formal operative terms of the Settlement as set forth in the Stipulation.  *Id*.

After the Settling Parties reached an agreement in principle on the material substantive terms of the Settlement, Plaintiffs' Counsel and Defendants' Counsel commenced negotiations regarding attorneys' fees and expenses commensurate with the value of the Settlement benefits and the contributions of Plaintiffs' Counsel to the Settlement.  The fee negotiations were facilitated and supervised by the Mediator, who was familiar with the complexity of the issues, risks, and challenges here, as well as Plaintiffs' Counsel's efforts in securing the Settlement.   On October 5, 2023, Plaintiffs' Counsel and Defendants' Counsel accepted the Mediator's proposal as to the Fee and Expense Amount.  *Id*.

## III.    TERMS OF THE PROPOSED SETTLEMENT

No later than its second regular quarterly meeting following Settlement approval, Funko shall adopt the Measures set forth in **Exhibit A** for a period of at least four (4) years from adoption (the "Minimum Term").  *See* Stip., §V.2.1 & Ex. A.[6]

---

[6] The Measures may only be modified in the event a majority of the independent members of Funko's Board of Directors determines in a good faith exercise of their business judgment that such modification is necessary to comply with an applicable

8

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

The Measures include the following:

1.    Creation of a new position of Senior Director of Environmental, Social
and Governance ("ESG Director"), who will report directly to the Chief
Legal Officer; will be responsible for re-evaluating all aspects of Funko's
business through the lens of environmental, social, and governance policy
and best practices; and will work with a team of cross-functional leaders
and outside consultants, identify critical strategic ESG goals and develop
a roadmap to achieve the same, collect data about key ESG performance
indicators, and report to the Board about progress toward those goals.

2.    Appointment of a new independent director and measures to enhance
diversity in potential director nominee pools.

3.    Amendments to the Nominating and Corporate Governance Committee
Charter to provide that final approval of all prospective director
candidates must be determined only by the full Board, and that the most-
up-to date versions of the Corporate Governance Guidelines must be
made widely available to the public.

4.    Amendments to the Audit Committee Charter to require the Audit
Committee to compile potential independent auditors and keep that list
updated, and to provide that no CFO who was involved in any of Funko's
previous five financial audits may be appointed.

5.    A requirement that management must prepare and distribute to the Audit
Committee quarterly inventory reports, which must include information
about the current levels and changes in inventory levels and any other

---

law, regulation, or fiduciary duty.  In that event, the Stipulation sets for the process
for adopting substitute measures.  Stip., §V.2.1.

inventory-related topics or trends that management determines should be brought to the Audit Committee's attention.

6.     Amendments to the Compensation Committee Charter to require the Committee to perform an annual review of compensation for all non-employee directors, including a review of director compensation at Funko's peer companies and recommendations to the Board regarding changes to compensation.

7.     Charter amendments providing that the respective Chairs of the Nominating and Corporate Governance Committee, the Audit and Compliance Committee, and the Compensation Committee may not serve as the Chair of any other Board committee.

8.     A requirement that the independent directors of the Board meet in executive session, outside the presence of any executive officer, at least quarterly.

9.     Enhancements to the Company's disclosure controls and procedures, including: (i) expanding the composition of the Disclosure Committee and Co-Chairs to include additional members of senior management; (ii) requiring that the Disclosure Committee review and evaluate relevant inventory and sales data and other key operational metrics in connection with the preparation and approval of the Company's annual and quarterly SEC filings; (iii) providing that the Disclosure Committee shall report directly to the Audit Committee; and (iv) requiring formal minutes of all Disclosure Committee meetings.

10.    Requirements that Funko's Controller: (i) act as the liaison between management (*e.g.*, the Disclosure Committee) and the Audit Committee; (ii) perform a pre-publication review of draft quarterly and annual reports and related materials relating to the identification and disclosure of any material financial reporting compliance risks; and (iii) work with Funko's Chief Legal Officer / Deputy General Counsel to evaluate the adequacy of Funko's internal controls and develop proposals for improvements, including through mandatory quarterly meetings.

11.    A requirement that Funko's Chief Legal Officer / Deputy General Counsel promptly report to the Audit Committee any allegations of compliance and ethics concerns relating to fraud, financial reporting violations, or material compliance risks regarding financial reporting and recommend remedial actions, including public disclosure of the risk.

12.    Enhancements to Funko's Insider Trading Policy to provide that the implementation and amendment of all 10b5-1 Trading Plans and all proposed transactions in Funko securities by Section 16 officers not executed pursuant to a Rule 10b5-1 Trading Plan must be pre-approved by the Company's Chief Legal Officer (or equivalent), or, if the transaction is entered into by the Chief Legal Officer, pre-cleared by the Company's CFO.

13.    Enhancements related to stockholder proposals and meetings, including providing that: (i) stockholders shall have the right to ask questions and to receive answers and discussion from the CEO and directors; (ii) before the Company files a proxy statement recommendation as to any stockholder proposal, a draft of that recommendation shall be reviewed

11

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

by the Board; and (iii) the Board may engage outside counsel or other advisors to assist in its review of any stockholder proposal at the Company's expense.

14.     The implementation of periodic training for all members of the Board and an annual training program for employees involved in preparing the Company's financial statements, communications with the Company's independent auditor, and disseminating or producing the Company's public statements.

## IV.    <u>PRELIMINARY APPROVAL STANDARDS</u>

Under Federal Rule of Civil Procedure ("Rule") 23.1(c), "[a] derivative action may be settled . . . only with the court's approval." It is well-settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat. Bank*, 216 U.S. 582, 595 (1910); *see also Officers for Just. v. Civ. Serv. Comm'n of San Francisco*, 688 F.2d 615, 635 (9th Cir. 1982) (recognizing that the "settlement process [is] favored in the law"); *U.S. v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) (explaining that "there is an overriding public interest in settling and quieting litigation").

Accordingly, the Court has a "strong judicial policy that favors settlements," particularly in stockholder derivative and other complex actions. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *In re NVIDIA Corp. Deriv. Litig.*, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) ("settlements are favored" because "shareholder derivative actions are 'notoriously difficult and unpredictable,'" and "substantial judicial resources can be conserved by avoiding formal litigation"); *In re Xoma Corp. Sec. Litig.*, 1992 U.S. Dist. LEXIS 10502, at *3–4 (N.D. Cal. July 10, 1992) ("The law

12

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

favors settlement of cases and quieting of litigation, particularly in complex class actions and derivative litigation.").

In a derivative action, proposed settlement approval "generally proceeds in two stages"—a hearing on preliminary approval followed by a final fairness hearing. *True v. Am. Honda Motor Co., Inc.*, 2009 WL 838284, at \*3 (C.D. Cal. Mar. 25, 2009) (citing *Manual For Complex Litigation* §21.632 (4th Ed. 2004)). While Plaintiffs believe the Settlement merits final approval, the Court need only ***preliminarily*** approve the Settlement at this time. At the preliminary approval stage, the court's evaluation of proposed settlement terms is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Just.*, 688 F.2d at 625; *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

Preliminary approval is a low threshold, requiring the Court to determine only "whether a proposed settlement is 'within the range of possible approval'" as fair, reasonable and adequate and that "notice should be sent to" stockholders. *True*, 2009 WL 838284, at \*3. Plaintiffs respectfully submit that the Settlement is well within the range of possible approval and should therefore be preliminarily approved.

## V.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.    The Settlement Enjoys A Presumption Of Fairness Because It Is The Product Of Good Faith, Arm's-Length Negotiations

A settlement achieved through significant good-faith, arm's-length negotiations by well-informed counsel enjoys a "presumption of fairness." *Villanueva v. Morpho Detection, Inc.*, 2015 WL 4760464, at \*6 (N.D. Cal. Aug. 12, 2015); *see also In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173–74 (S.D.N.Y. 2000) ("If the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex []

litigation, the Settlement will enjoy a presumption of fairness.").  Indeed, the Ninth Circuit has made clear that significant weight should be attributed to the parties' belief that the litigation should be settled on the proposed terms, since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."  *Pac. Enters.*, 47 F.3d at 378; *see also In re First Cap. Holdings Corp. Fin. Prod. Sec. Litig.*, 1992 WL 226321, at *2 (C.D. Cal. June 10, 1992) (finding the belief of counsel that the proposed settlement represented the most beneficial result for the class to be a compelling factor in approving settlement); *Clark v. Ecolab Inc.*, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) ("Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement.") (alteration in original).

Here, the Settlement was negotiated between experienced counsel possessing a firm understanding of the strengths and weaknesses of the claims and defenses asserted, is the product of significant "give and take" by the Settling Parties, and was reached after extensive, months-long negotiations after two formal mediation sessions between the Settling Parties and their respective counsel.  Stip., §§I–II.  Each of the Settling Parties was represented by zealous and able counsel with extensive experience in complex derivative litigation.  Counsel also were well-informed about the legal and factual issues presented as they conducted extensive research and investigation into their claims and the underlying issues in the investigation.  This investigation included, *inter alia*: (i) analyzing Funko's public SEC filings, press releases, announcements, transcripts of investor conference calls, and news articles; (ii) reviewing the publicly-available pleadings against Funko related to the allegations in the Litigation; (iii) analyzing the allegations contained in the related Securities Class Action; (iv) researching, drafting, and filing stockholder derivative complaints; (v) reviewing more than 1,200 pages of internal corporate books and records that were

produced to Plaintiffs by Funko in connection with the Litigation; (vi) researching the applicable law with respect to the claims asserted (or which could be asserted) in the Litigation and the potential defenses thereto; (vii) researching corporate governance issues; (viii) preparing detailed litigation and settlement demands; (ix) participating in the Full-Day Mediation and Half-Day Mediation; (x) engaging in extensive pre- and post-mediation settlement discussions and exchanging extensive corporate governance reform proposals and counteroffers, with the Mediator and counsel for the Defendants; and (xi) negotiating and drafting the settlement documentation for presentment to the Court. Stip., §II.

The Settling Parties and their respective counsel have determined on an informed basis that the proposed Settlement represents a fair, reasonable, beneficial, and practical resolution of highly uncertain litigation, and that its terms fairly account for the risks and potential rewards of the claims being settled. Significantly, the independent members of Funko's Board (including all independent, non-defendant members) have determined, in a good faith exercise of their business judgment, that: (i) the litigation demands, the Litigation, and the Plaintiffs' and Plaintiffs' Counsels' efforts were a substantial and material factor in Funko's decision to adopt, implement and maintain the Measures for the agreed upon term, (ii) the Measures provide a significant and material benefit to Funko and its stockholders; and (iii) the Settlement and each of its terms are fair, reasonable, and in the best interests of Funko and its stockholders. Stip., §IV

The assistance of a well-respected and neutral Mediator provides further assurances that the Settlement was reached fairly. *See HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, 2010 WL 4027632, at *2 (S.D. Cal. Oct. 14, 2010) (prolonged "negotiations for several months . . . and the active involvement of the [respected] mediator . . . . weighs considerably in favor of concluding this is not a collusive settlement"); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)

("[M]ediator's involvement . . . helps to ensure that the proceedings were free of collusion and undue pressure.").

**B.**    **The Settlement Is Well Within The Range Of Possible Approval**

    **1.**    **The Settlement Confers Substantial Benefits On Funko And Its Stockholders**

In assessing whether to approve a stockholder derivative settlement, "[t]he principal factor to be considered . . . is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re Pinterest Deriv. Litig.*, 2022 WL 484961, at *3 (N.D. Cal. Feb 16, 2022) (citing *In re Apple Computer, Inc. Deriv. Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008); *In re OSI Sys., Inc. Deriv. Litig.*, 2017 WL 5642304, at *2 (C.D. Cal. May 2, 2017). District courts may weigh a variety of other factors, including: "the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, the amount offered in settlement, the stage of the proceedings, the experience and views of counsel, and the reaction of class members to the proposed settlement." *In re: Hewlett-Packard Co. S'holder Deriv. Litig.*, 716 F. App'x 603, 605 (9th Cir. 2017); *Lloyd v. Gupta*, 2016 WL 3951652, at *6 (N.D. Cal. July 22, 2016).

Courts have long "recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *In re NVIDIA Corp. Deriv. Litig*, 2009 U.S. Dist. LEXIS 24973, at *11–12 (N.D. Cal. Mar. 18, 2009); *see also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in nature."); *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor."); *Pinterest*, 2022 WL 484961, at *3

(recognizing that the relevant settlement's proposed "corporate therapeutics" would provide Pinterest with "nonnegligible benefits").

Thus, district courts routinely approve settlements based on corporate governance reforms designed to prevent the alleged conduct that precipitated the litigation. *See, e.g.*, *Apple Computer*, 2008 WL 4820784, at *2; *Lewis v. Anderson*, 692 F.2d 1267, 1271 (9th Cir. 1982) (finding that corporate governance reforms are "sufficiently beneficial to a corporation" to warrant settlement approval and an attorneys' fee award); *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving derivative action settlement where corporate therapeutics "significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company").

Here, the Measures directly address the claims asserted in the Litigation and confer substantial benefits upon Funko and Current Funko Stockholders. *See* §III, *supra*. This Litigation concerns alleged false and misleading public statements concerning the Company's sales and growth, inventory management, and financial forecasting. *See* §I.A, *supra*. To address these alleged issues, the Settlement requires the Audit Committee Charter to be amended to ensure adequate audit and finance function, and the Audit Committee will now receive quarterly inventory reports from management, ensuring that the Audit Committee and the Board are aware of levels and changes in the Company's inventory levels and other relevant inventory-related topics and trends. Stip., Ex. A, §III.B.

The Measures will help create a more independent, diverse, and better-functioning Board, including through the creation of the new position of ESG Director, who will report to the Board. *Id.*, §I. Significantly, the Measures also call for the addition of a new independent director along with enhanced processes that will ensure diversity in the pools of potential future director nominees and full Board

approval for ultimate nomination to the Board.  *Id.*, §II.  The Measures also provide for an enhanced director training program.  *Id.*, §III.D.  Finally, the Charter of the Compensation Committee also will be amended to require an annual review of non-employee director compensation.  *Id.*, §III.C.

In addition to Board-level reforms, the Settlement also addresses the issues at the heart of the Litigation at the management level by ensuring that all relevant members of senior management serve on and in appropriate roles on the Disclosure Committee and requiring that the Disclosure Committee review and evaluate relevant inventory and sales data and other key operational metrics in connection with the preparation and approval of the Company's annual and quarterly SEC filings.  *Id.*, §V. The Measures also provide that the Disclosure Committee shall report directly to the Audit Committee.  Moreover, the Settlement enhances the duties and responsibilities of Funko's Controller, who shall act as the liaison between management (*e.g.,* the Disclosure Committee) and the Audit Committee, perform a pre-publication review of draft quarterly and annual reports and related materials to identify and disclose material legal and regulatory risks, and work with the Chief Legal Officer and Deputy General Counsel to evaluate the adequacy of Funko's internal controls and develop proposals for improvements.  *Id.*, §VIII.

The Litigation also alleges that certain defendants sold Funko stock while in possession of allegedly material non-public information.  Accordingly, the Settlement requires Funko's Insider Trading Policy to be amended to provide that the implementation and amendment of all 10b5-1 plans and all proposed transactions in Funko securities by Section 16 officers not executed pursuant to a Rule 10b5-1 plan must be pre-approved by the Chief Legal Officer (or equivalent), or, if the transaction is entered into by the Chief Legal Officer, pre-cleared by the CFO.  *Id.*, §VI.

Finally, the Settlement provides for increased stockholder transparency and access in connection with annual stockholder meetings and stockholder proposals. *Id.*, §IV.

The Measures confer economic value upon Funko and its stockholders in at least three significant ways.

*First*, the Measures substantially reduce the likelihood that any alleged oversight and disclosure failures will recur and that Funko and its stockholders will suffer the potential loss of investor confidence and legal and/or regulatory exposure as a result of similar allegations in the future. *See, e.g., In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006 (Del. Ch. Mar. 28, 2011) (in approving derivative settlement, quantifying benefit of therapeutics intended to prevent recurrence of misconduct by multiplying damages flowing from original misconduct by estimated risk of recurrence but for new governance reforms).

*Second*, more rigorous, independent, and effective oversight will: (i) improve corporate decision-making and execution of key corporate strategies; (ii) improve the Company's business prospects; (iii) ensure accurate disclosures to investors and the public at large; and (iv) reduce the costs associated with failure to comply with disclosure and other legal or regulatory requirements. Numerous studies have confirmed that investors are willing to pay a premium for stock in well-governed corporations, thus driving substantial increases in long-term stockholder value.[7]

*Finally*, the Measures confer economic value by laying the foundation necessary to enhance investor confidence in the accuracy of the Company's public

---

[7] *See* Middleton Decl., **Exhibit 2** (P. Gompers, J. Ishii & A. Metrick, *Corporate Governance and Equity Prices,* 118 Quarterly Journal of Economics 1, pp. 107–55 (2003)); *id.,* **Exhibit 3** (Brown, L. D., Ph.D., & Caylor, M. L., *The Correlation between Corporate Governance and Company Performance*, Institutional Shareholder Services (2004)); *id.*, **Exhibit 4** (V. Cunant, M. Gina & M. Guadalupe, *The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value,* 67 Journal of Finance, American Finance Association 5, pp. 1943–77 (Oct. 2012)).

disclosures, the integrity of its management, and the independence and effectiveness of the Company's corporate governance and Board oversight.  Investors pay a premium for stock in companies with strong corporate governance relative to peer companies perceived to have weaker governance because strong governance correlates with long-term value creation.

Funko has agreed to maintain the Measures for a minimum of four (4) years, which is a meaningful amount of time to ensure that the Measures become embedded in the Company's policies, practices, and corporate culture, thus protecting against discontinuation of these Measures following the four-year period.  *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 850 (E.D. Mo. 2005) (finding that corporate governance enhancements that must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

### 2.    The Risk And Expense Of Trying To Improve Upon The Settlement Through Further Litigation

Although Plaintiffs believe the derivative claims were meritorious, there exist significant risks in continuing to prosecute the Litigation, including that Plaintiffs would not be able to recover anything for the benefit of Funko.  "[T]he odds of winning [a] derivative lawsuit [a]re extremely small."  *Pac. Enters.,* 47 F.3d at 378; *Cohn*, 375 F. Supp. 2d at 852; *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973). These low odds particularly resonate at the pleadings stage, where alleging either that Funko's Board wrongfully refused (in the case of the Demand Made Action and the Delaware Demand Made Action) or that a demand would have been futile (in the case of the Demand Futility Action) would present a significant hurdle for plaintiffs.  *See, e.g., Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990) (courts apply business judgment presumption that, in responding to litigation demand, the directors "acted on an informed basis, in good faith and in the honest belief that the action taken was

in the best interests of the company"); *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *7 n.51 (Del. Ch. Feb. 12, 2009) ("Demonstrating wrongful refusal is more daunting than demonstrating demand futility.").

Even if Plaintiffs were able to survive the pleadings stage, they would need to secure evidence sufficient to overcome motions for summary judgment that they are entitled to the "business judgement rule," which affords directors the presumption that they acted on an informed basis and in the good faith belief that their actions taken were in the best interest of the company. If Plaintiffs were to prevail beyond that stage, they still would need to ultimately succeed at trial and on appeal. The discovery required before trial would be exceedingly costly, complex, and time-consuming, as it would encompass subjects unique to this derivative litigation.

Moreover, the related Securities Class Action settled for just $7 million, and that entire amount was paid using insurance money, meaning that Funko did not pay out of its own pocket to resolve the Securities Class Action, limiting the potential economic harm allegedly suffered by the Company that would be recoverable through this derivative Litigation.

In light of the risks and costs of continued litigation, the substantial benefits of the proposed Settlement, which were only achieved through the Settling Parties' hard-fought negotiations, demonstrate that the Settlement is "within the range of possible approval." *True*, 2009 WL 838284, at *3.

## VI.    <u>NOTICE TO STOCKHOLDERS</u>

Federal Rule of Civil Procedure 23.1 requires "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). The rule provides courts with considerable discretion, within the circumstances of the particular case, to determine the manner in which notice will be provided. *Maher*, 714 F.2d at 450–51.

21

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

Funko has agreed to provide notice to Funko stockholders by: (i) posting a copy of the Notice (**Exhibit C** to the Stipulation) and the Stipulation and exhibits on the investor relations page of the Company's website; (ii) publishing the Summary Notice (**Exhibit D** to the Stipulation) in *Investor's Business Daily* and issuing a press release with *GlobeNewswire*; and (iii) filing the Notice and Stipulation with the SEC as exhibits to a Form 8-K.  Stip., §V.3.2.

The proposed Notice describes in plain English the terms and conditions of the proposed Settlement, including: (i) the facts and considerations that caused the Settling Parties and their respective counsel to conclude that the proposed Settlement is fair, reasonable, adequate, and in Funko's best interests; (ii) the procedure for objecting to the proposed Settlement; and (iii) the date, place, and time of the Settlement Hearing.  Stip., Ex. C.  The proposed Notice is reasonably calculated to apprise Funko's stockholders of the pendency and Settlement of the Litigation and afford them an opportunity to present their objections, if any.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

The proposed manner of notice via publication has gained broad acceptance in light of the rapid transition of the investment community from a paper-based to a web-based disclosure system.  Indeed, the notice program employed in this case has been widely used in similar stockholder derivative settlements and approved by numerous courts as meeting due process.  *See, e.g.*, *In re PMC-Sierra, Inc. Deriv. Litig.*, 2010 U.S. Dist. LEXIS 5818, at *4 (N.D. Cal. Jan. 26, 2010) (approving notice to absent stockholders by publication in the national edition of *Investor's Business Daily* and posted on company's website).

## VII.  <u>PROPOSED SCHEDULE OF EVENTS</u>

The Settling Parties also request that the Court establish the date by which: (i) Notice of the Settlement will be given to Funko stockholders; (ii) Funko's stockholders may object to the Settlement; and (iii) the Settlement Hearing shall occur. Plaintiffs propose the following schedule:

| | |
|---|---|
| Notice posted on the Funko website, published in *Investor's Business Daily* and in a press release via *GlobeNewswire*, and filed with the SEC | Within 20 calendar days after entry of the Preliminary Approval Order |
| Deadline for opening briefs and supporting documents in support of final approval of the Settlement | At least 21 calendar days before the Settlement Hearing |
| Deadline for Funko stockholders to object to the Settlement | At least 14 calendar days before the Settlement Hearing |
| Deadline for Settling Parties to file papers in response to stockholder objections | At least 7 calendar days before the Settlement Hearing |
| Settlement Hearing | At least 45 days after entry of the Preliminary Approval Order |

This schedule is similar to those used in numerous other stockholder derivative and class action settlements and provides sufficient due process to Funko's stockholders with respect to their rights concerning the Settlement. *See, e.g.*, *In re Finisar Corp. Deriv. Litig.*, No. 5:06-cv-07660-RMW-HRL, slip op. (N.D. Cal. Aug. 15, 2013) (Middleton Decl., **<u>Exhibit 5</u>**); *In re Extreme Networks, Inc. S'holder Deriv. Litig.*, No. 5:07-cv-02268-RMW, slip op. (N.D. Cal. May 4, 2011) (Middleton Decl., **<u>Exhibit 6</u>**).

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion and enter the Preliminary Approval Order attached as **<u>Exhibit B</u>** to the Stipulation and submitted concurrently herewith: (i) granting preliminary approval of

23

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

the Settlement; (ii) approving the form and content of the Notice; and (iii) setting a
date for the Settlement Hearing.

Respectfully submitted,

Dated: March 4, 2024

**JOHNSON FISTEL, LLP**

*/s/ Brett M. Middleton*
BRETT M. MIDDLETON

FRANK J. JOHNSON
JONATHAN M. SCOTT
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
brettm@johnsonfistel.com
frankj@johnsonfistel.com
jonathans@johnsonfistel.com

*Attorneys for Plaintiff Grant Smith*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Grant Smith, certifies that this
brief contains 6,728 words, which complies with the word limit of L.R. 11-6.1.

*/s/ Brett M. Middleton*
BRETT M. MIDDLETON

Case No.: 2:22-cv-03155-WLH (MAA)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL